

FILED by _____ D.C.

ELECTRONIC

**Feb. 10, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | **09-CV-14044-Moore-Lynch** |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | |
| WALTER JANKE, M.D., LALITA | ) | JURY TRIAL DEMANDED |
| JANKE and MEDICAL RESOURCES, | ) | |
| L.L.C. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

---

### COMPLAINT

The United States of America alleges as follows:

### I. Introduction

1. This is an action brought by the United States of America against Walter Janke, M.D., Lalita Janke, and Medical Resources, L.L.C. (MR) for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and for damages under the common law theories of unjust enrichment and payment by mistake.

2. Defendants, Walter and Lalita Janke, and MR knowingly presented and made or

1

caused to be presented and made false or fraudulent claims and statements to representatives of the United States Medicare Program to cause Medicare to make risk adjustments overpayments to America's Health Choice Medical Plan (AHC), a now defunct Medicare Advantage Organization (MAO). The claims were false or fraudulent because they contained diagnoses codes that were not substantiated by the medical records or the medical conditions of the Medicare beneficiaries served by AHC.

3. On August 6, 2008, the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida entered an order placing AHC under the supervision of a receiver with the Florida Department of Financial Services.

## II. **Jurisdiction and Venue**

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1345. The Court has supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants under 31 U.S.C. § 3732(a) and because each of the defendants reside within and/or are doing and/or previously did business within this District.

5. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) because the defendants transact or transacted business in this District and a substantial part of the events giving rise to the above-captioned action occurred in this District.

## III. **Parties**

6. The United States brings this action on behalf of its agency, the Department of Health and Human Services (HHS) and its component, the Centers for Medicare & Medicaid Services

2

(CMS).

7.  Walter Janke, M.D. is the husband of Lalita Janke.  Upon information and belief, he resides and, at all times relevant to this Complaint, has resided within this District.  Walter Janke's last known address is 2136 N. Porpoise Point Lane, Vero Beach, Florida 32963.  Walter and his wife Lalita Janke were the sole shareholders of AHC and MR.

8.  Lalita Janke, is the wife of Walter Janke, M.D.  Upon information and belief, she resides and, at all times relevant to this Complaint, has resided within this District.  Lalita Janke's last known address is 2136 N. Porpoise Point Lane, Vero Beach, Florida 32963.  Lalita and her husband Walter Janke were the sole shareholders of AHC and MR.

9.  The defendant, MR, is a health care organization that operates primary care clinics and was affiliated with AHC through common ownership, management, and control.  MR's last known business address is 1175 South U.S. Highway One, Vero Beach, Florida 32962.

## IV.  <u>Background</u>

### <u>The Medicare Advantage - Prescription Drug Program</u>

10.  Medicare, enacted in 1965 as Title XVIII of the Social Security Act, is a federally run health insurance program benefitting those who are age 65 and older and the disabled.  42 U.S.C. § 1395c and j <u>et seq</u>.  Medicare Parts A and B are fee-for-service insurance programs that cover inpatient and outpatient care respectively.  In 1997, Congress enacted Medicare Part C to allow Medicare beneficiaries to opt out of traditional fee-for-service coverage.  42 U.S.C. § 1395w-21 <u>et seq</u>.  Under Part C, beneficiaries can enroll in Medicare Advantage plans, which are privately

run managed care plans that provide coverage for both inpatient and outpatient services. Since 2003, when Congress created Medicare Part D which provides partial coverage for prescription drugs, many MAO plans also provide coverage for prescription drugs. 42 U.S.C. § 1395w-101 et seq.

11. The Centers for Medicare and Medicaid Services (CMS) is a division of HHS and it is responsible for the reimbursement, administration, and supervision of the Medicare Program. CMS contracts directly with MAOs. Pursuant to contractual agreement, CMS makes prospective monthly risk adjustment payments to the MAO to provide health care and prescription drug coverage.

12. Initially, Medicare payments to MAOs were based solely upon demographic information. *2003 Regional Risk Adjustment Training for Medicare+Choice Organizations - Participant Guide* ("*Participant Guide*"), pg. 1-1(attached). To improve the accuracy and fairness of payments, in 2004 CMS implemented a new payment model that also takes into account the health risk, i.e., diagnoses, of the patient. *Id.* at 1-1. Risk adjustment payments are higher for enrollees with major medical conditions and lower for healthy enrollees. *Id.*

13. The new payment model, often referred to as a CMS-Hierarchical Condition Category model (CMS-HCC), uses demographic and diagnostic information from the current year to predict total payments for the following year. *Participant Guide*, pg. 1-3. Under the CMS-HCC model, diagnostic information must be obtained through a face-to-face encounter between the patient and the treating physician. *Participant Guide* pp. 3-2 & 3-5. The physician must document the facts supporting the diagnosis in the patient's medical record and sign and

4

date the record.  An accurate code must be assigned to the diagnoses in accordance with the

*International Classification of Diseases, 9th Edition, Clinical Modification (ICD-9-CM)*

*Guidelines for Coding and Reporting.  Participant Guide* pp. 4-3 - 4-4.  Typically, physicians use

encounter forms to record a patient's diagnosis with the appropriate ICD-9-CM diagnoses codes

to assist in preparing data for submission to CMS.

14. Healthy beneficiaries will have no ICD-9-CM diagnoses codes.  Less healthy

beneficiaries may have multiple ICD-9-CM codes or diagnoses.  However, not all ICD-9-CM

codes are part of the CMS payment model.  In other words, not all diagnoses affect payment.

*Participant Guide* pg. 1-9.  Risk adjustment payments are higher only for enrollees diagnosed

with major medical conditions such as diabetes, cancer, heart disease, etc.

15. When requesting risk adjustment payments from Medicare, the MAO must submit

demographic data and, if beneficiaries have one or more major medical conditions, they must

submit an accurate ICD-9-CM code for the condition that is supported by the beneficiaries'

medical files.  The head of the MAO plan must sign an Attestation Form attesting upon best

knowledge, information, and belief that the ICD-9-CM codes submitted are accurate, complete,

and truthful.  The Attestation Form also contains an acknowledgment by the MAO plan that the

diagnoses submitted directly affect the calculation of CMS risk adjustment payments to the MAO

plan.

16.  CMS groups ICD-9-CM codes it receives from the MAO plan into separate disease

categories known as Hierarchal Condition Categories or HCCs.  *Participant Guide* 1-9.  The

HCCs are based upon the type of disease and the costs of treating it.  A beneficiary may have one

or more HCC.  CMS calculates a risk score for each beneficiary based upon the HCCs and demographics.  The risk score determines the risk adjustment payment to be made to the plan on behalf of the beneficiary.  The higher a beneficiary's risk score, the higher the risk adjustment payment.  *Participant Guide* pp. 1-1 & 1-8.

17.  The MAO's assignment of an ICD-9-CM code is the most important factor in determining what HCC code is assigned to the beneficiary.  CMS relies upon the MAO to assign the correct ICD-9-CM code.  An MAO plan that assigns unsupported ICD-9-CM codes may improperly increase the risk adjustment payment it receives from Medicare.

18.  CMS provides MAOs with a one-time per calendar year opportunity to reconcile risk adjustment payments.  It allows the MAO a period of approximately 12 months after the initial data submission deadline to submit additional or corrected ICD-9-CM codes.  In 2004, the year the CMS-HCC payment model was implemented, CMS allowed MAO plans approximately 18 months to submit additional or corrected codes.

### The Jankes, AHC, and MR

19.  From 2000 through July 2007, AHC operated as a Medicare Advantage plan.  It contracted with CMS, pursuant to Parts C and D of the Medicare Program, to provide medical and prescription drug coverage to its beneficiaries on the Treasure Coast of Florida.[1]  In exchange, CMS paid AHC monthly risk adjustment payments.  In 2005, CMS paid AHC approximately $12 million in monthly risk adjustment payments and, in 2006, it paid AHC

---

1. AHC's service area included all of Broward, Indian River, Martin, Palm Beach, Okeechobee, and St. Lucie Counties, and part of Brevard County.

6

approximately $14 million monthly.

20.  AHC contracted with MR, a health care organization, to provide or arrange for
the provision of primary care health services and some speciality services to AHC's
beneficiaries.  In exchange, AHC paid MR compensation in excess of 80% of the risk adjustment
payments AHC received from CMS.

21.  Walter and Lalita Janke, husband and wife, were the sole shareholders of AHC and
they were actively involved in the day-to-day operations of AHC.  Walter Janke had an 80%
ownership interest and Lalita Janke had a 20% ownership interest in AHC.  Walter Janke was the
Chief Executive Officer of AHC and Chairman of its board of directors.  Lalita Janke held
various positions within AHC including Executive Vice President and Chief Operating Officer.

22.  Walter and Lalita Janke, husband and wife, also were the sole shareholders of MR
and were actively involved in the day-to-day operations of MR.  Walter Janke had an 80%
ownership interest and Lalita Janke has a 20% ownership interest in MR.  Walter Janke was a
member of MR's board of directors and Lalita Janke was MR's Chief Executive Officer.

## The Medicare Fraud

23.  From at least 2004 through at least July 2007, Walter and Lalita Janke, and MR
engaged in a pattern and practice of submitting false and fraudulent claims for payment to
Medicare knowing that these claims were false, acting in reckless disregard for the truth, or with
deliberate ignorance of their truth or falsity, by improperly assigning ICD-9-CM codes that were
not documented by the medical records or supported by the medical conditions of AHC's

7

Medicare beneficiaries. This damaged the United States by causing it to pay more to AHC than the amount to which AHC was entitled.

24. CMS is unable to verify the accuracy of diagnoses codes at the time the MAO submits them because it is not provided with supporting documentation at that time. Rather, CMS relies upon the MAO to submit medically supported diagnoses in the first instance and also to delete any diagnoses later determined by the MAO to be unsupported.

25. The defendants knowingly failed to review claims for erroneous data before submitting them for payment to CMS. Their practice was to knowingly submit as many diagnosis codes as possible without regard to their truthfulness and let CMS attempt to catch any inaccuracies.

26. The defendants also failed to delete diagnoses from CMS's data base that they later found to be erroneous. The defendants used a computer system, MedDirect, created and operated by the Janke's son, Rick Janke. MedDirect was incapable of deleting data from CMS's data base. It was capable only of submitting data to CMS. Thus, defendants knowingly used a software system that was incapable of deleting unsupported or false data. This is a violation of section 6.12.3 of the CMS *Participant Guide* which requires MAOs to delete records when an erroneous diagnosis cluster has been submitted to CMS. *Participant Guide* at pg. 6-12.

27. MedDirect's shortcomings were discussed at AHC meetings and in correspondence in which Walter and Lalita Janke took part. However, it was not until January 2007, approximately six months before the termination of AHC's Medicare contract, that changes were made to MedDirect to enable it to delete or filter out incorrect or inappropriate data submitted to

8

CMS.

28. On July 6, 2005, because of long-standing quality of care concerns, CMS notified AHC by letter that it would be terminating AHC's Medicare contract. Administrative appeals and litigation ensued. When termination appeared imminent, Lalita Janke expressed her intent to obtain as much money as possible from CMS before the contract expired. Lalita and Walter Janke and MR became more flagrant in their efforts to obtain monies from CMS by submitting claims with false diagnoses codes.

29. Between February and May 2006, at the direction of Walter and Lalita Janke, and MR, the first of two retrospective patient record reviews, or "data sweeps" was conducted. The defendants hired a team of mostly unlicensed physicians to review approximately 3,000 patient files for evidence of diagnoses during 2004 dates of service to submit to CMS for additional payment. Lalita Janke urged the team to search for any evidence of major medical conditions such as diabetes, end stage renal disease, congestive heart failure, etc. that would generate high payments from CMS.

30. The unlicensed physicians created spreadsheets of ICD-9-CM diagnoses codes found during the reviews. They also created new encounter forms for the diagnoses which they sent to the treating physicians for signature. Many of the treating physicians refused to sign the new encounter forms or were unavailable to do so because they had left AHC's employ. According to Rick Janke, the defendants imported the diagnoses codes from the spreadsheets created during each of the data sweeps into MedDirect even though many of the encounter forms were not signed by a physician. This is a flagrant violation of section 3.1.1. of the CMS *Participant Guide*

9

which requires that diagnoses be obtained as a result of a face-to-face visit with a physician. *Participant Guide* at pp. 3-2 & 3-5.  On May 15, 2006, the defendants submitted the codes from the first data sweep to CMS for payment.

31.  During the first data sweep, team members determined that numerous unsubstantiated ICD-9-CM codes had been submitted by AHC to CMS and they reported this finding to the defendants.  However, the defendants took no action to correct this.  They did not delete the diagnoses codes because of MedDirect's limitations nor did they notify CMS. As a result of this first data sweep, AHC received a $14 million additional payment from CMS.

32.  Again, at the defendant's direction, another retroactive data sweep was conducted between October 2006 and January 2007.  The team of unlicensed physicians focused on 2005 dates of service and reviewed over 7,000 patient files.  On January 31, 2007, the defendants again made a retroactive submission to CMS containing diagnoses collected during the sweep.  To ensure that future payments were based upon the codes collected during the sweep, the defendants used MedDirect's newly created delete function to delete previously submitted codes.

33.  CMS postponed the termination of AHC's contract to allow AHC to solicit buyers for the health plan.  In the fall of 2006, one potential buyer conducted a due diligence analysis that revealed that AHC's medical records did not support its risk adjustment submissions.  It reported the results of its due diligence analysis to Walter and Lalita Janke, and MR and it declined to go forward with the purchase.  Thus, the defendants received independent confirmation of what they already knew, i.e., that AHC's risk adjustment submissions contained false claims.

10

34. Around that same time, the defendants retained an expert to conduct their own review of AHC's risk adjustment submissions. The expert's analysis also found that AHC's medical records did not support its risk adjustment submissions to CMS. The expert reported this information to Walter and Lalita Janke, and MR. Thus, the defendants again received independent confirmation that their risk adjustment submissions to CMS contained false claims.

35. A second potential buyer of AHC conducted a due diligence analysis of AHC in early 2007. This analysis also found that AHC's medical records did not support its risk adjustment submissions and the potential buyer reported this information to Walter and Lalita Janke, and MR. Thus, the defendants again received independent confirmation that their risk adjustment submissions contained false claims. Despite their knowledge of the false submissions, neither the Jankes nor MR reported this information to CMS nor did they refund the overpayments made to AHC by CMS.

36. Finally, on July 19, 2007, because long-standing quality of care issues posed a "serious risk to the health of the individuals enrolled with the organization," CMS terminated AHC's Medicare contract.

37. The defendants' knowing failure to delete diagnoses codes known to be false, violation of CMS Guidelines, use of MedDirect which they knew to be flawed, conduct of data sweeps, and other activities generated unsubstantiated ICD-9-CM codes which the defendants knowingly included in AHC's regular and retroactive submissions to CMS in support of its requests for payment. Thus, Walter and Lalita Janke and MR presented and made or caused to be presented and made claims and statements that were false as to the accuracy, completeness,

11

and truthfulness of the ICD-9-CM codes to obtain risk adjustment payments to which they were not entitled.

### CMS's Audit

38. CMS conducted an audit of risk adjustment payments made to AHC for the 2006 calendar year based upon diagnoses codes submitted by the defendants for dates of service between January and December 2005. CMS chose a random sample of 193 beneficiaries from the AHC population of beneficiaries with diagnosis codes.

39. The 193 beneficiaries had a total of 550 assigned HCCs based upon the diagnoses codes submitted by AHC. (Some beneficiaries had multiple HCCs.) CMS requested that AHC provide medical records to substantiate the HCCs and a review of those medical records was conducted by an independent contractor. The results of the medical record review revealed that 61%, or 335 of the 550 HCCs, could not be substantiated by AHC's medical records.

40. For each beneficiary in the sample, CMS determined that AHC was paid an average of $3,015 as a result of unsubstantiated HCCs. It was able to extrapolate its results to the AHC population by multiplying this amount by the number of AHC beneficiaries with HCCs, i.e., 9,456 beneficiaries. The product of these two figures, $28,509,840 is the amount by which AHC was overpaid, i.e., the debt owed the United States.

41. In addition, statistics compiled by CMS show that, in calendar year 2006, AHC's risk scores were 33% higher than other Florida MAOs and 27% higher than other MAOs nationally. Also, in 2006, AHC beneficiaries had 65% more HCCs than beneficiaries from other Florida MAOs and 45% more HCCs that all other MAOs. In other words, AHC was submitting claims

and falsely representing that its patient population was far sicker than the patient population of its state and national peers.

## COUNT I
## FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS
## (31 U.S.C. § 3729(A)(1))
## (Against Walter Janke, Lalita Janke, and MR )

42.  Plaintiff United States repeats and re-alleges each allegation in paragraphs 1 through 41, as if fully set forth herein.

43.  Walter and Lalita Janke, and MR knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

44.  By virtue of the false or fraudulent claims made by Walter and Lalita Janke, and MR, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
## FALSE CLAIMS ACT: MAKING OR USING FALSE
## RECORD OR STATEMENT
## (31 U.S.C. § 3729(A)(2))
## (Against Walter Janke, Lalita Janke, and MR)

45.  Plaintiff United States repeats and re-alleges each allegation in paragraphs 1 through 41, as if fully set forth herein.

46.  Walter and Lalita Janke, and MR knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

47.  By virtue of the false or fraudulent records or statements made by Walter and Lalita

Janke, and MR , the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
## UNJUST ENRICHMENT
### (Against Walter Janke, Lalita Janke, and MR)

48. Plaintiff United States repeats and re-alleges each allegation in paragraphs 1 through 41, as if fully set forth herein.

49. This is a claim for recovery of monies by which Walter and Lalita Janke, and MR have been unjustly enriched.

50. By directly or indirectly obtaining Medicare funds to which they were not entitled, Walter and Lalita Janke, and MR were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT IV
## PAYMENT BY MISTAKE
### (Against Walter Janke, Lalita Janke, and MR)

51. Plaintiff United States repeats and re-alleges each allegation in paragraphs 1 through 41, as if fully set forth herein.

52. This is a claim for recovery of monies paid by the United States to Walter and Lalita Janke, and MR as a result of mistaken understandings of fact.

53. The United States, acting in reasonable reliance upon the accuracy and truthfulness of the information provided by Walter and Lalita Janke, and MR, paid AHC certain sums of money to which it was not entitled.  Walter and Lalita Janke, and MR are thus liable to account and pay

14

such amounts to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

1. On the First and Second Causes of Action under the False Claims Act, against defendants Walter and Lalita Janke, and MR, treble damages, civil penalties, and costs;

2. On the Third and Fourth Causes of Action against defendants Walter and Lalita Janke, and MR, for unjust enrichment, and payment by mistake for the damages sustained and/or amounts by which these defendants were unjustly enriched or illegally paid, plus interest, costs and expenses.

Respectfully Submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

R. ALEXANDER ACOSTA
United States Attorney
Southern District of Florida

MARILYNN K. LINDSEY
Assistant U.S. Attorney
Florida State Bar No. 023-0057
500 East Broward Boulevard, Ste. 700
Fort Lauderdale, Florida 33394
Telephone: (954) 356-7255
Fax: (954) 356-7180
Marilynn.Lindsey@USDOJ.gov

15

JOYCE R. BRANDA
DANIEL R. ANDERSON
ANDREA J. LARRY
Attorneys
U.S. Department of Justice
Commercial Litigation Branch
601 D Street, NW
Washington, DC 20004
Telephone:  (202) 307-0396
Fax: (202) 514-0280
Andrea.Larry@USDOJ.gov

**Attorneys for the United States of America**

16

# PARTICIPANT GUIDE



2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations
Participant Guide

**RISK ADJUSTMENT & THE CMS-HCC MODEL**

## MODULE 1 – RISK ADJUSTMENT & THE CMS-HCC MODEL

### Purpose (Slide 2)

To provide an explanation of risk adjusted payment under the CMS-HCC payment model for the M+C program.

### Objectives (Slide 3)

At the completion of this module, participants will:

- Understand the purpose of risk adjustment
- Understand the components of risk adjusted payments and know how to calculate a risk factor
- Understand the new enrollee factors
- Understand the long-term institutional model
- Understand the frailty adjuster
- Understand the new schedule based on elimination of the payment lag
- Understand plan-level data reported in HPMS



**ICON KEY**
Example                        ⊠
Reminder
Resource                       📖
IT/Systems Track               🖧
Data Collection Track          ◼

### 1.1    The Purpose of Risk Adjustment



**Purpose:** To pay Medicare+Choice (M+C) organizations accurately and fairly by adjusting payment for enrollees based on demographics and health status.

- Traditionally payments to M+C organizations were based solely on demographic information.
- Risk adjustment provides more accurate payments for M+C organizations. Payments are higher for less healthy enrollees and lower for more healthy enrollees.



**2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations
Participant Guide**

CENTERS for MEDICARE & MEDICAID SERVICES

**RISK ADJUSTMENT & THE CMS-HCC MODEL**

### 1.3    CMS-HCC Risk Adjustment Payment Model (Slide 5)

In 2003, after public comment, the CMS-HCC model was finalized as the risk adjustment payment model. The goal was to select a clinically sound risk adjustment model that improved payment accuracy while minimizing the administrative burden on M+C organizations. The model is a revision of the Hierarchical Condition Category model, originally developed by Health Economics Research, Inc. The CMS-HCC model functions by categorizing ICD-9-CM codes into separate groups of clinically related codes, e.g., diabetes, cancer, ischemic heart disease, infections, etc.

---

**Characteristics of the CMS-HCC Model**

- *Selected Significant Disease (SSD) Model*
  - **Serious manifestations of a condition are considered rather than all levels of severity of a condition**
  - **Model is additive**
  - **Includes most body systems and conditions with a high prevalence among the frail elderly**
  - **Incorporates conditions that are likely to be disease managed**
  - **Community version includes 65 disease groups**
- *Prospective Model*
  - **Like PIP-DCG, CMS-HCC uses diagnostic information from a base year to predict costs and adjust payment for the following year**
- *Demographic Variables*
  - **Demographic variables will continue to be components of the risk adjusted payment calculation even at 100% model implementation**
  - **Demographic variables are:  age, sex, Medicaid eligibility, disabled status, and reason for original entitlement to Medicare (i.e., disability)**
- *Site Neutral*
  - **Model does not distinguish payment based on a site of care**
- *Considers Multiple Chronic Diseases*
  - **Risk adjusted payment is based on assignment to disease groups, also known as HCCs**
- *Includes Disease Interactions and Hierarchies*
  - **Interactions allow for additive factors based on chronic conditions and disabled status to increase payment accuracy**
  - **Hierarchies allow for payment based on the most serious conditions when less serious conditions also exist**
- *Distinguishes Between Community-Based and Long-Term Institutionalized Enrollees*
  - **Different than institutional factor used in the demographic-only model**
  - **Long-term institutionalized defined as enrollees with greater than 90 days residence in an institution**
  - **Payments for institutional enrollees are generally less than payments for similarly ill beneficiaries residing in the community**
  - **Institutional model includes 47 disease groups**

---



2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations
Participant Guide

**RISK ADJUSTMENT & THE CMS-HCC MODEL**

**NOTE:** Until the CMS-HCC is implemented at 100% in 2007, a demographic payment as calculated above will continue to be part of the risk adjusted payment.

📖   The county rate book for 2004 payment is available at:  http://cms.hhs.gov/healthplans/rates/

### 1.5.3  Components of the Risk Score

The risk score used in calculating payments under the CMS-HCC model includes demographics as part of the risk model as well as different disease groups or HCCs. The model allows for the recognition of coexisting diseases when calculating payment by recognizing multiple chronic conditions that the beneficiary has. Interactions (i.e., combinations) are used to account for expected costs that are higher because, for example, multiple, coexisting diseases cause additional complications. Hierarchies are imposed to provide payments only for the most severe manifestation of a certain disease.

### 1.5.3.1    Demographic Factors (Slide 18)

The risk score uses five demographic factors in calculating the risk score under the CMS-HCC model, including age, sex, Medicaid status, disability and original reason for Medicare entitlement (i.e., disability). Each of these characteristics was part of the PIP-DCG calculation as well.

***Age and Sex***:  Based upon the enrollee's age and sex, risk adjusted demographic factors are assigned for the calculation of the enrollee's risk factor.

In the past, the model has considered a person's increasing age by placing them into age groups during a given year by either switching the payment group during the year in the demographic payment model or by paying a weighted average of the 2 groups each month to avoid having to switch age groups during the year (as with the PIP-DCG model). Under the CMS-HCC model CMS will now base payments for the entire payment year upon the age an enrollee attains as of **February 1st** of each year. This change will help simplify the M+C payment system.

📖   See Attachment C for the complete list of age and sex risk factors for 2004

***Medicaid***:  The Medicaid status of an enrollee will continue to be part of the risk adjusted payment calculation under the CMS-HCC model, but only for individuals residing in the community.

Medicaid status is defined as at least one month of Medicaid eligibility during the data collection period (which is typically defined as the year prior to payment). New enrollees with Medicaid status will be identified for each month in the payment year and paid at reconciliation.

An individual's Medicaid status will be identified using the Medicare Beneficiary Database (MBD). The source of the Medicaid designation is either from the health plan or from third party payor files.

📖   See Attachment C for the complete list of Medicaid factors for 2004

***Disabled Status***:  Under the CMS-HCC model, additional payments are made for disabled individuals residing in the community. The disabled factors for enrollees under 65 years-old are labeled as "disabled"



**CENTERS for MEDICARE & MEDICAID SERVICES**

**2003 Regional Risk Adjustment Training**
**For Medicare+Choice Organizations**
**Participant Guide**

**RISK ADJUSTMENT & THE CMS-HCC MODEL**

and those over 65 years-old are labeled as "aged". Disabled status is identified in the Medicare Beneficiary Database (MBD).

***Original Reason for Medicare Entitlement***:  The factors labeled "originally disabled" apply to enrollees that are 65 years-old or over who were originally entitled for Medicare due to disability.

### 1.5.3.2  Disease Groups/HCCs (Slide 21)

Disease groups contain major diseases and are broadly organized into body systems. For risk adjustment purposes, we will refer to disease groups as HCCs. The HCC assigned to a disease is determined by the ICD-9-CM (International Classification of Diseases, 9th Edition, Clinical Modification) diagnosis codes that are submitted during a data collection period. Only selected diagnosis codes are included in the CMS-HCC model. There are 65 distinct disease groups for payment for community residents and 47 disease groups for payment for long term institutionalized persons.

⊠   **Example 1**

| Disease Group/HCC | Description |
| --- | --- |
| HCC 92 | Specified Heart Arrhythmia |
| HCC 158 | Hip Fracture/Dislocation |

### 1.5.3.3  Disease Interactions (Slide 22)

Certain combinations of coexisting diagnoses present in an individual can increase their medical costs. The CMS-HCC model recognizes these higher costs through incorporating payments for disease interactions.

There are 6 disease interactions in the community model and 2 in the institutional model. Examples of the disease interactions include a two-way combination of diabetes mellitus (DM) and congestive heart failure (CHF) or a three-way combination of chronic obstructive pulmonary disease (COPD), cerebrovascular disease (CVD), and coronary artery disease (CAD).

In calculating this part of the risk score for an individual, the individual score for each HCC is added and then the disease interaction score is added. In the example below, the risk adjusted payment would include an additional factor when an enrollee has both diabetes mellitus and congestive heart failure.

⊠   **Example 2**

Two-disease Interaction for Community-Based Enrollee
    Factor 1:  Diabetes Mellitus (DM), HCC15 = 0.764
    Factor 2:  Congestive Heart Failure (CHF), HCC80 = 0.417
    Factor 3:  Interaction:  DM*CHF = 0.253

    Risk Score = (demographics) + 0.764 + 0.417 + 0.253

In this case, the enrollee receives an additional interaction instead of only 2 factors for HCC15 and HCC80.



**2003 Regional Risk Adjustment Training**
**For Medicare+Choice Organizations**
**Participant Guide**

**DATA COLLECTION**

## Guiding Questions

### 3.1.1  What are the appropriate sources of data?  (Slide ⅍6)

**Hospital Inpatient**   Those facilities that offer medical services that require an overnight stay.

**Hospital Outpatient**   Therapeutic and rehabilitation services for sick or injured persons who do not require inpatient hospitalization or institutionalization.

✓ **Physician**   Medical services provided by a physician or by specific non-physician practitioners as the result of a face-to-face visit.

### 3.1.2  Are the providers covered entities for risk adjustment? (Slide ⅍7, ■6)

There are several sources that may be used to verify that the data are acceptable for risk adjustment. Hospital inpatient and hospital outpatient data have associated Medicare provider numbers.

- M+C organizations should verify that diagnoses are provided by Medicare certified hospitals/facilities.
- All network hospital facilities must be Medicare certified and will have a Medicare provider number.

The provider number has six characters. The first two characters are numerals and represent the State/territory as illustrated in Table 3A.

| STATE | CODE | STATE | CODE | STATE | CODE |
|-------|------|-------|------|-------|------|
| Alabama | 01 | Kentucky | 18 | Oklahoma | 37 |
| Alaska | 02 | Louisiana | 19 | Oregon | 38 |
| American Samoa | 64 | Maine | 20 | Palau | N/A |
| Arizona | 03 | Maryland | 21 | Pennsylvania | 39 |
| Arkansas | 04 | Massachusetts | 22 | Puerto Rico | 40 |
| California | 05 | Michigan | 23 | Rhode Island | 41 |
| Colorado | 06 | Minnesota | 24 | South Carolina | 42 |
| Connecticut | 07 | Mississippi | 25 | South Dakota | 43 |
| Delaware | 08 | Missouri | 26 | Tennessee | 44 |
| District of Columbia | 09 | Montana | 27 | Texas | 45 |
| Florida | 10 | Nebraska | 28 | Utah | 46 |
| Georgia | 11 | Nevada | 29 | Vermont | 47 |
| Guam | 65 | New Hampshire | 30 | Virgin Islands | 48 |
| Hawaii | 12 | New Jersey | 31 | Virginia | 49 |
| Idaho | 13 | New Mexico | 32 | Washington | 50 |
| Illinois | 14 | New York | 33 | West Virginia | 51 |
| Indiana | 15 | North Carolina | 34 | Wisconsin | 52 |
| Iowa | 16 | North Dakota | 35 | Wyoming | 53 |
| Kansas | 17 | Ohio | 36 | | |

**TABLE 3A – PROVIDER NUMBER STATE ASSIGNMENTS**

States and territories are included in the list of Medicare provider numbers.


CENTERS for MEDICARE & MEDICAID SERVICES

**2003 Regional Risk Adjustment Training**
**For Medicare+Choice Organizations**
**Participant Guide**

**DATA COLLECTION**

Only those physician specialties and other clinical specialists identified in Table 3D are acceptable for risk adjustment. The Medicare provider number does not apply to the collection of physician data.

| Code | Specialty | Code | Specialty | Code | Specialty |
|------|-----------|------|-----------|------|-----------|
| 01 | General Practice | 29 | Pulmonary Disease | 68* | Clinical Psychologist |
| 02 | General Surgery | 30* | Diagnostic Radiology | 70* | Multispecialty Clinic or Group Practice |
| 03 | Allergy/Immunology | 33 | Thoracic Surgery | 76 | Peripheral Vascular Disease |
| 04 | Otolaryngology | 34 | Urology | 77 | Vascular Surgery |
| 05 | Anesthesiology | 35 | Chiropractic | 78 | Cardiac Surgery |
| 06 | Cardiology | 36 | Nuclear Medicine | 79 | Addiction Medicine |
| 07 | Dermatology | 37 | Pediatric Medicine | 80 | Licensed Clinical Social Worker |
| 08* | Family Practice | 38 | Geriatric Medicine | 81 | Critical Care (Intensivists) |
| 10 | Gastroenterology | 39 | Nephrology | 82 | Hematology |
| 11 | Internal Medicine | 40 | Hand Surgery | 83 | Hematology/Oncology |
| 12 | Osteopathic Manipulative Therapy | 41 | Optometry (specifically means optometrist) | 84 | Preventive Medicine |
| 13 | Neurology | 42 | Certified Nurse Midwife | 85 | Maxillofacial Surgery |
| 14* | Neurosurgery | 43 | Certified Registered Nurse Anesthetist | 86* | Neuropsychiatry |
| 16* | Obstetrics/Gynecology | 44* | Infectious Disease | 89 | Certified Clinical Nurse Specialist |
| 18 | Ophthalmology | 46* | Endocrinology | 90 | Medical Oncology |
| 19 | Oral Surgery (Dentists Only) | 48* | Podiatry | 91 | Surgical Oncology |
| 20* | Orthopedic Surgery | 50* | Nurse Practitioner | 92 | Radiation Oncology |
| 22* | Pathology | 62* | Psychologist | 93 | Emergency Medicine |
| 24 | Plastic and Reconstructive Surgery | 64 | Audiologist | 94* | Interventional Radiology |
| 25 | Physical Medicine and Rehabilitation | 65 | Physical Therapist | 97 | Physician Assistant |
| 26* | Psychiatry | 66 | Rheumatology | 98 | Gynecologist/Oncologist |
| 28 | Colorectal Surgery | 67 | Occupational Therapist | 99 | Unknown Physician Specialty |

*indicates that a number has been skipped

**TABLE 3D – ACCEPTABLE PHYSICIAN DATA SOURCES**


Qualified physician data for risk adjustment requires a face-to-face visit with the exception of pathology and radiology services (professional component only).



**CENTERS for MEDICARE & MEDICAID SERVICES**

**2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations
Participant Guide**

**CODING WORKSHOP**

| DOCUMENTATION SOURCE | DOCUMENTATION PRACTICES |
|---|---|
| **Hospital Inpatient** | • Generally meets most documentation requirements due to regulatory and certification requirements.<br>• Records are typically arranged in sections, such as progress notes, orders, labs, operative episodes, medications, and nursing notes.<br>• Discharge summaries, history, physicals, consultations, and procedure reports are usually transcribed, which is extremely helpful for legibility.<br>• The most regulated and consistent in storage and retention standards. Retention and destruction of record standards vary from State to State. In the absence of State regulations, it is generally recommended that adult medical records are kept for at least 7 years to allow for the legal statute of limitations. Current technology in record reproduction makes it possible for hospitals to retain the records for much longer in a fraction of the space required for paper records.<br>• The codes submitted by hospitals have most likely been through some level of code edits to assure that the code is, at a minimum, a current, valid, ICD-9-CM code.<br>• Most hospitals also require certified coding staff and maintain coding compliance programs. |
| **Hospital Outpatient** | • Typically, records supporting hospital-based outpatient claims are clear and concise.<br>• Documentation includes the patient identification, the procedure or test performed, and emergency room records or clinic progress notes.<br>• Since they are hospital records, many of the same regulations for inpatient records documentation and retention apply. |
| **Physician Offices** | • Physician office documentation standards are generally not as rigorous as hospital regulated record standards.<br>• Physician offices range from single practitioners with few office staff to large groups of physicians with a high level of office support and technology. Therefore, their documentation practices vary widely.<br>• The variety of physician documentation includes hand written progress notes, pre-printed check-off forms, transcribed and typed letters, or output from electronic medical records.<br>• Typically, the core source of physician record documentation is hand-written notes. These may require additional analysis by coders and reviewers to accurately extract the information necessary for complete coding.<br>• It is important to determine the author(s) of physician office notes. In addition to a signature, other means of identification of the physician documenting the note may be necessary. |

**TABLE 4A – COMMON DOCUMENTATION PRACTICES**

## 4.3   Introduction to ICD-9-CM Diagnosis Coding (Slide ■10)

One of the many uses of quality medical record documentation is to confirm and validate the diagnosis codes that are reported for risk adjustment. This section will address how the coding process works and why clear, concise, consistent, complete, and legible documentation of diagnoses is so important. Appropriate International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM) diagnosis coding is important for risk adjustment because:



**2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations
Participant Guide**

**CODING WORKSHOP**

- The Medicare program recognizes ICD-9-CM as the official diagnosis code set for all providers.
- The CMS-HCC model utilizes ICD-9-CM codes for risk payment calculation.
- Organizations are required to submit, at a minimum, all relevant ICD-9-CM diagnoses that are in the CMS-HCC model for risk adjusted payment.

📖 Official ICD-9-CM guidelines are available through the CDC web site:
   www.cdc.gov/nchs/data/icd9/icdguide.pdf.

📖 The most recent official guideline revision is also published in *Coding Clinic for ICD-9-CM*, second quarter, 2002. The AMA Central Office on ICD-9-CM publishes quarterly official code advice in *Coding Clinic for ICD-9-CM*.

The Coding Clinic for ICD-9-CM is the approved resource to update and clarify official coding guidelines. The small volumes (typically about 20 pages) include clarifications of previous advice and guidelines or new information on a specific diagnosis coding practice by means of articles and a question and answer section.

ICD-9-CM Coordination and Maintenance Committee updates the ICD-9-CM. A transcript of the diagnosis part of the committee meetings is available on NCHS' website at http://www.cdc.gov/nchs/icd9.htm.

**The ICD-9-CM updates are effective October 1st each year with a 90-day grace period for providers and M+C Organizations to submit either the old or new codes while making changes to their internal forms and systems.**

## 4.3.1 ICD-9-CM Basic Steps and Guidelines (Slides 11-12)

A basic understanding of the ICD-9-CM process can assist the organizations in:

- Determining possible causes of ICD-9-CM coding errors
- Communicating diagnosis related collection issues to provider staff
- Developing and maintaining information systems that meet the clinical data collection needs of the organization
- Understanding and communicating with beneficiaries on clinical issues important to them
- Planning for future services



**CMS**
CENTERS for MEDICARE & MEDICAID SERVICES

**2003 Regional Risk Adjustment Training**
**For Medicare+Choice Organizations**
**Participant Guide**

**DATA SUBMISSION**

### 6.12.3   M+C Organization Responsibilities Regarding Deletions

- M+C organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS Database.

- If a diagnosis cluster is deleted for the purpose of correcting data, the M+C organization is responsible for submitting the correct diagnosis cluster. Conversely, if the M+C organization submits corrected data, the M+C organization must submit the appropriate deletion records. That is, if the correct diagnosis cluster is submitted, the erroneous diagnosis cluster cannot be ignored.

- If a correction applies to the same beneficiary as the deletion, the correction may be included in the same CCC record as the deletion (do not exceed 10 diagnosis clusters per CCC record).

- If the corrected diagnosis cluster belongs to a different beneficiary than the deleted diagnosis cluster, the correct diagnosis cluster may be submitted in the same file as the deletion.

### 6.12.4   2003 Reconciliation Data

After September 27, 2002, payment year 2003 reconciliation hospital inpatient data (discharge dates: July 1, 2001 through June 30, 2002) must be submitted as a 111 or 11Z bill type. The most recent information will be stored. This is similar to the overlay process used prior to the automated *encounter data* adjustment process described above. The "From" and "Through" dates will be checked to identify duplicate transactions and determine which of the duplicate transactions was submitted most recently. The latest version will be utilized in the risk adjustment model, and the remaining submissions will be discarded.



**2003 Regional Risk Adjustment Training
For Medicare+Choice Organizations**

CENTERS for MEDICARE & MEDICAID SERVICES

**TABLE OF CONTENTS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... I-1


**MODULE 1 – RISK ADJUSTMENT & THE CMS–HCC MODEL** ............................................ 1-1
1.1        The Purpose of Risk Adjustment ................................................................ 1-1
1.2        Background of Medicare+Choice Risk Adjustment ...................................... 1-2
1.3        CMS-HCC Risk Adjustment Payment Model ............................................... 1-3
1.4        Changes in M+C Payments ........................................................................ 1-4
1.5        M+C Payments Under the CMS-HCC Model ............................................... 1-4
1.5.5      County Rate Book ..................................................................................... 1-4
1.5.1.1    Characteristics of the Managed Care Rate Book Prior to 1997 .................. 1-4
1.5.1.2    County Rate Book Calculation after the BBA ............................................. 1-5
1.5.2      Risk Rate Book .......................................................................................... 1-5
1.5.2.1    Adjustment for Budget Neutrality ............................................................. 1-6
1.5.2.2    Fee-for Service Normalization Adjustment ................................................ 1-6
1.5.3      Components of the Risk Score ................................................................... 1-8
1.5.3.1    Demographic Factors ................................................................................ 1-8
1.5.3.2    Disease Groups/HHCs ............................................................................... 1-9
1.5.3.3    Disease Interactions ................................................................................. 1-9
1.5.3.4    Disabled/Disease Interactions ................................................................. 1-10
1.5.3.4    Disease Hierarchies ................................................................................. 1-10
1.5.4      Beneficiaries Disease Profile Data ........................................................... 1-11
1.5.5      New Enrollee Factors ............................................................................... 1-11
1.6        Long-Term Institutional Model ................................................................ 1-11
1.7        Frailty Adjuster ....................................................................................... 1-13
1.7.1      Why Do We Have a Frailty Adjuster? ....................................................... 1-13
1.7.2      Which Organizations Will Be Paid Under Frailty Adjustment? ................... 1-13
1.7.3      How Does the Frailty Adjuster Work Under the CMS-HCC Model? ............ 1-14
1.7.4      How is ADL Information Collected? ........................................................... 1-14
1.7.5      Calculating the Frailty Score .................................................................... 1-14
1.8        Payment Methodology for M+C End Stage Renal Disease (ESRD) Enrollees ... 1-16
1.9        Final submission of Risk Adjustment Data (Reconciliation) ....................... 1-16
1.10       Payment Blends ...................................................................................... 1-17
1.11       Risk Adjustment Schedule & Elimination of Payment Lag ......................... 1-18
1.12       2003 Estimator Data Impacts .................................................................. 1-20
1.13       Quarterly Diagnosis Counts Report .......................................................... 1-20


**MODULE 2 –RISK ADJUSTMENT PROCESS OVERVIEW** ............................................ 2-1
2.1        Common Risk Adjustment Terms .............................................................. 2-1
2.2        Risk Adjustment Process Overview ........................................................... 2-2
2.2.1      Risk Adjustment Data Requirements ......................................................... 2-2
2.2.2      Risk Adjustment Data Collection ............................................................... 2-2
2.2.3      Risk Adjustment Data Submission ............................................................ 2-3
2.2.4      Risk Adjustment Dataflow ........................................................................ 2-4
2.2.5      Important Information About Risk Adjustment Processing .......................... 2-5

≈JS 44   (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

United States of America

**(b)**  County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Andrea J. Larry
U.S. Department of Justice
601 D Street, N.W.                           202/307-0396
Washington, D.C. 20004        See Attachment  ⊞

## DEFENDANTS

Walter H. Janke, Lalita M. Janke & Medical Resources, LLC

County of Residence of First Listed Defendant   **Indian River**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

See attachment

**(d)** Check County Where Action Arose:   ☐ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☑ INDIAN RIVER   ☐ OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☑ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

*2:09 CV 14044 - Moore - Lynch*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|                            | PTF | DEF |                                                  | PTF | DEF |
|----------------------------|-----|-----|--------------------------------------------------|-----|-----|
| Citizen of This State      | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State   | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | Under Equal Access to Justice |
| | Employment | ☐ 550 Civil Rights | Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | |
| | Other | | Detainee | | ☐ 950 Constitutionality of State |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | Statutes |
| | | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☑ 1  Original Proceeding   ☐ 2  Removed from State Court   ☐ 3  Re-filed- (see VI below)   ☐ 4  Reinstated or Reopened   ☐ 5  Transferred from another district (specify)   ☐ 6  Multidistrict Litigation   ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO

JUDGE                                    DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

U.S. Civil Statute: 31 U.S.C. 3729 Brief Descrintion:  Making false claims to receive Medicare navments  ⊞
LENGTH OF TRIAL via  10  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $ 84 million CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE          SIGNATURE OF ATTORNEY OF RECORD                                    DATE

**FOR OFFICE USE ONLY**

AMOUNT *WAIVED*   RECEIPT # _____                    IFP _____

# Attachment to Civil Cover Sheet

| Attorneys for Plaintiffs | Attorneys for Defendants |
|---|---|
| ANDREA J. LARRY<br>Attorney<br>U.S. Department of Justice<br>Commercial Litigation Branch<br>601 D Street, NW<br>Washington, DC 20004<br>Telephone:  (202) 307-0396<br>**Attorney of Record**<br><br>DANIEL R. ANDERSON<br>U.S. Department of Justice<br>Commercial Litigation Branch<br>601 D Street, NW<br>Washington, DC 20004<br>Telephone:  (202) 616-2451<br><br>MARILYNN K. LINDSEY<br>Assistant U.S. Attorney<br>Florida State Bar No. 023-0057<br>500 East Broward Boulevard, Ste. 700<br>Fort Lauderdale, Florida 33394<br>Telephone: (954) 356-7255 | Counsel for Walter Janke:<br>JANE W. MOSCOWITZ, P.A.<br>Moscowitz & Moscowitz, P.A.<br>Mellon Financial Center<br>1111 Brickell Avenue, Suite 2050<br>Miami, Florida 33131<br>Telephone: (305) 379-8300<br><br>Counsel for Lalita Janke:<br>DAVID O'BRIAN<br>JODY GOODMAN<br>Crowell & Moring, LLP<br>1001 Pennsylvania Ave., NW<br>Washington, DC 20004<br>Telephone: (202) 624-2850<br><br>Counsel for Medical Resources, LLC:<br>TINA DUNSFORD*<br>Foley & Lardner, LLP<br>100 North Tampa Street<br>Suite 2700<br>Tampa, Florida 33602<br>Telephone: (813) 225-4120<br>*unclear whether Ms. Dunsford continues to<br>represent Medical Resources LLC |